DON'T TEAR IT DOWN, INC.,
Appellant,

v.

PENNSYLVANIA AVENUE DEVELOP-
MENT CORPORATION et al.

No. 79–2330.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 25, 1980.

Decided Aug. 20, 1980.

Filed Oct. 2, 1980.

Phyllis J. Cohen, Washington, D.C., of the bar of the District of Columbia, by special leave of Court pro hac vice, with whom David Bonderman and S. Mark Tuller, Washington, D.C., were on brief, for appellant.

Larry A. Boggs, Atty., Dept. of Justice, Washington, D.C., with whom James W. Moorman, Asst. Atty. Gen., Dept. of Justice, Charles F. C. Ruff, U.S. Atty., John Oliver Birch, Asst. U.S. Atty., Peter R. Steenland, Jr., Atty., Dept. of Justice and John M. Fowler, Gen. Counsel, Advisory Council on Historic Preservation, were on brief, John A. Terry, Asst. U.S. Atty., Judith W. Rogers, Corp. Counsel, and Richard W. Barton, Deputy Corp. Counsel, and Richard B. Nettler, Asst. Corp. Counsel, District of Columbia, Washington, D.C., for appellees.

Joseph M. Fries, Rodney F. Page and Howard V. Sinclair, Washington, D.C., were on brief for Square 254 Ltd. Partnership, amicus curiae, urging affirmance.

Before ROBINSON, MacKINNON and MIKVA, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBINSON.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

The principal question for decision is whether a federal instrumentality can be required to comply with the District of Columbia's Historic Landmark and Historic District Protection Act[1] before obtaining a demolition permit as a step in implementing the federal program established by the Pennsylvania Avenue Development Corporation Act of 1972.[2] The District Court answered this question in the negative and, perceiving no legal justification for denial of the permit, refused to enjoin its issuance. We affirm.

I

In 1972, Congress adopted the PADC Act to provide for the rehabilitation of the area adjacent to Pennsylvania Avenue between the Capitol and the White House. In so doing, Congress declared "that it is in the national interest that the area . . . be developed, maintained, and used in a manner suitable to its ceremonial, physical, and historic relationship to the legislative and executive branches of the Federal Government and to the governmental buildings, monuments, memorials, and parks in or adjacent to the area."[3] Congress found that this area, "because of its blighted character, imposes severe public, economic, and social liabilities upon the District of Columbia as the seat of the government of the United States;"[4] accordingly, it ordered that a master plan for the area be prepared and executed by "a Federal corporation which can take maximum advantage of the private as well as the public resources which will be necessary."[5]

The PADC Act defined a target area of approximately 25 acres.[6] And it created

---

1. D.C. Law 2–144, 25 D.C.Reg. 6939 (1979) [hereinafter cited as D.C. Historic Protection Act].

2. Pub.L.No.92–578, 86 Stat. 1266 (1972), codified at 40 U.S.C. §§ 871 *et seq.* (1976 & Supp. II 1978) [hereinafter cited as PADC Act]. The case presents one additional issue. See note 49 *infra.*

3. PADC Act § 2(a), 40 U.S.C. § 871(a) (1976).

4. *Id.* § 2(b), 40 U.S.C. § 871(b) (1976).

5. *Id.*

6. *Id.* § 2(f), 40 U.S.C. § 871(f) (1976); H.R.Rep. No.92–1445, 92d Cong., 2d Sess. 2 (1972), U.S. Code Cong. & Admin.News 1972, p. 4721 [hereinafter cited as House Report].

the Pennsylvania Avenue Development Corporation, a federal entity to be managed by a board of fifteen voting and eight nonvoting members drawn from federal and District of Columbia agencies, and from the locality as well.[7] PADC was instructed to prepare a development plan in cooperation with the Department of the Interior, the General Services Administration and the District of Columbia Government,[8] and after completion to submit it to the Secretary of the Interior and the Mayor of the District of Columbia for approval or recommended modifications.[9] Thereafter, a final plan was to be worked out [10] and transmitted to Congress; [11] upon expiration of sixty legislative days without a resolution by either House opposing the plan, PADC would proceed with its implementation.[12] An express command of the Act is that "[a]ctivities under the development plan shall be carried out in accordance with the approved development plan;" [13] while PADC can alter the plan, the changes must be put through the process requisite for the original provisions.[14]

PADC is armed with a variety of powers to cope with the exigencies of executing the plan.[15] Some room is left, however, for other agencies to function in the development area, so long as they do not depart from the approved design. Thus Section 7(a) of the Act provides:

> Nothing in the [Act] shall preclude other agencies or instrumentalities of the Federal Government or of the District of Columbia from exercising any lawful powers in the development area consistent with the development plan or the

provisions and purposes of the [Act]; but no such agency or instrumentality shall release, modify, or depart from any feature or detail of the development plan without the prior approval of [PADC].[16]

Moreover, by Section 9(b), PADC is required in its own activities to "comply with all District of Columbia laws, ordinances, codes, and regulations in constructing, reconstructing, rehabilitating, altering, and improving any project." [17] It was primarily this latter provision that gave birth to the instant litigation.

## II

The plan for reanimation of the Pennsylvania Avenue area was completed in 1974 and, after running its course through the statutory procedures, was sent to Congress the following year. Neither House posing any objection, the plan became operative in May of 1975.[18] Though comprehensive in scope, the plan does not undertake to establish precise developmental requirements for each of the numerous and diverse parcels of realty in the project area. Instead, the plan is–as of necessity it had to be–a more general and somewhat flexible type of blueprint, with varying degrees of specificity from one location to another.

Commenting on conditions in Square 254, in which an edifice known as the Munsey Building is situated, the plan states that "[t]here are few structures of landmark quality in this square." [19] The Munsey Building itself is described as a "well–defined, early 20th Century commercial building" [20] which is "somewhat outdated

---

7. PADC Act §§ 3(a), (c)–(g), 40 U.S.C. §§ 872(a), (c)–(g) (1976 & Supp. II 1978).

8. *Id.* § 5(a)–(b), 40 U.S.C. § 874(a)–(b) (1976).

9. *Id.* § 5(c), 40 U.S.C. § 874(c) (1976).

10. *Id.* § 5(d), 40 U.S.C. § 874(d) (1976).

11. *Id.*

12. *Id.*

13. *Id.* § 5(e), 40 U.S.C. § 874(e) (1976).

14. *Id.*

15. See *id.* § 6, 40 U.S.C. § 875 (1976).

16. *Id.* § 7(a), 40 U.S.C. § 876(a) (1976).

17. *Id.* § 9(b), 40 U.S.C. § 878(b) (1976).

18. See note 12 *supra.*

19. Pennsylvania Avenue Plan 32 (1974), Joint Appendix (J.App.) 185 [hereinafter cited as Plan].

20. Plan 32, J.App. 185.

by competitive standards."[21] The plan explains that with the exception of two underdeveloped parcels, it "does not anticipate immediate redevelopment" in the square,[22] and that "[t]he National Press Building, the Munsey, National Theater and Loew's Theater Buildings could remain as long as their owners chose not to redevelop them."[23] But in illustration of one possibility, the plan depicts an area of redevelopment in Square 254 that includes the site now occupied by the Munsey Building.[24]

In 1977, PADC decided to acquire property in Square 254 "to expedite development in accordance with the Plan."[25] PADC also solicited proposals for redevelopment of an area designated Parcel 254–A, comprising all of Square 254 except the National Press Building and a building then under construction,[26] and 254 Limited Partnership was selected as developer from among the applicants.[27] A ground lease followed, and by it PADC is to deliver to 254 Limited Partnership the entire parcel, with the exception of the National Theatre, demolished to grade.[28]

Meanwhile, PADC had acquired the Munsey Building by condemnation.[29] After striking the bargain with 254 Limited Partnership, PADC applied to the District of Columbia for a permit to demolish the Munsey and four other buildings.[30] Because that structure stands in an area the District had designated as historic, however, compliance with the District's Historic Landmark and Historic District Protection Act of 1978[31] is a prerequisite under District law to issuance of a demolition permit.[32] That legislation, adopted by the Council of the District of Columbia,[33] requires review by the Mayor of applications for permits to demolish historic landmarks or buildings in historic districts,[34] prescribes the procedure therefor,[35] and specifies that "[n]o permit shall be issued unless the Mayor finds that issuance of the permit is necessary in the public interest, or that failure to issue a permit will result in unreasonable economic hardship to the owner."[36]

Since PADC had not sought clearance under the Historic Protection Act, its permit application was referred for a ruling.[37] PADC contended that demolition of the Munsey Building harmonized with the congressionally-approved plan for redevelopment of the Pennsylvania Avenue area.[38] District officials agreed,[39] and were prepar-

---

21. Plan 32, J.App. 185.

22. Plan 32, J.App. 185.

23. Plan 32, J.App. 185.

24. Plan 31, J.App. 184.

25. J.App. 230.

26. J.App. 240–241.

27. J.App. 246.

28. J.App. 252.

29. *Pennsylvania Ave. Dev. Corp. v. One Parcel of Land in the District of Columbia*, Civ. No. 79–1050 (D.D.C.). See PADC Act, § 6(6), 40 U.S.C. § 875(6) (1976).

30. J.App. 267.

31. D.C. Historic Protection Act, 25 D.C.Reg. 6939 (1979).

32. D.C. Historic Protection Act, § 5, 25 D.C. Reg. at 6946–6947.

33. By the District of Columbia Self–Government and Governmental Reorganization Act, Pub.L.No. 93–198, 87 Stat. 774 (1973), Congress extended a measure of home rule to the Federal City. Included in the grant was a delegation of certain legislative authority to the Government of the District of Columbia, *id.* tit. III, § 302, D.C.Code § 1–124 (Supp. V 1978), which is exercisable by its council, *id.* tit. IV, § 404, D.C.Code § 1–144 (Supp. V 1978), and which is the fountainhead of the D.C. Historic Protection Act.

34. D.C. Historic Protection Act, § 5, 25 D.C. Reg. at 6946–6947.

35. *Id.* §§ 5(a)–(d), (f)–(g), 25 D.C.Reg. at 6946–6949.

36. *Id.* § 5(e), 25 D.C.Reg. at 6947.

37. J.App. 284.

38. J.App. 270.

39. The key element in the District's concurrence was an opinion by its Corporation Counsel that, in the circumstances presented, the

ed to issue a permit therefor.[40] It was at this point that the instant litigation began.

Appellant, a nonprofit membership organization devoted to protection of the built environment, with a specific interest in preservation of buildings of architectural and historic value in the District of Columbia, filed a two-count complaint in the District Court.[41] The first count asked for enforcement of an agreement between PADC and the Advisory Council on Historic Preservation,[42] and for a declaration that PADC could not demolish the Munsey Building until discharge of its obligations under that agreement.[43] The second count sought an injunction against issuance of a permit authorizing the demolition save in accordance with the provisions of the Historic Protection Act.[44] The District Court advanced trial of the action on the merits, consolidated the trial with the hearing of appellant's motion for a preliminary injunction,[45] and denied injunctive relief.[46] As to the first count, the court found that parts of the agreement were inapplicable to demolition within the development area, and that PADC had met the requirements of the rest.[47] The ground for the court's disposition of the second count was that the District of Columbia had reasonably interpreted its Historic Protection Act as inoperable with respect to the Munsey Building.[48] Appellant then prosecuted this appeal.

### III

We think the District Court was eminently correct in denying relief with respect to PADC's agreement with the Advisory Council on Historic Preservation.[49] The court's holding that PADC need not comply

procedures of § 5 of the D.C. Historic Protection Act were inapplicable. See note 52 *infra*.

**40.** J.App. 284.

**41.** *Don't Tear It Down v. Pennsylvania Ave. Dev. Corp.*, Civ. No. 79–2609 (D.D.C.). See J.App. 4–9, 21–22.

**42.** The Council is an independent agency in the Executive Branch of the Federal Government existing pursuant to the National Historic Protection Act, 16 U.S.C. §§ 470 *et seq.* (1976), and charged with responsibility for advising the President and Congress on matters of historic preservation.

**43.** J.App. 4–9, 11, 21–22.

**44.** J.App. 9–12, 22.

**45.** J.App. 49–50. See Fed.R.Civ.P. 65(a)(2).

**46.** *Don't Tear It Down v. Pennsylvania Ave. Dev. Corp.*, *supra* note 41, memorandum and order (Nov. 6, 1979), J.App. 153–155.

**47.** *Id.* at 1–3, J.App. 153–155. See note 49 *infra*.

**48.** *Id.* at 3, J.App. 155. See text *infra* at notes 50–52.

**49.** The agreement, also joined by the District of Columbia state historic preservation officer, was entered into pursuant to the National Historic Preservation Act of 1966, 16 U.S.C. §§ 470 *et seq.* (1977). Among other things, PADC agreed to consult with the preservation officer before becoming a party to any transfer of property having historical and architectural significance (¶ 2); to schedule new construction for a given site before any building on that site is demolished (¶ 4); to develop general design and construction guidelines for new structures (¶ 5); and to provide documents according to the standards of the Historic American Building Survey for deposit with the Library of Congress before razing any building under the Pennsylvania Avenue area redevelopment plan (¶ 6). J.App. 37. Appellant asserts that it is entitled to injunctive relief because of repeated violations of these provisions by PADC.

We are, however, not persuaded. As noted by the District Court, *Don't Tear It Down v. Pennsylvania Ave. Dev. Corp.*, *supra* note 41, memorandum and order (Nov. 6, 1979), J.App. 154, PADC and the Advisory Council jointly interpret provisions two and five as being simply inapplicable to situations such as the one before us; it is of course a truism that the interpretation placed upon a contract by the parties is entitled to great deference, see, *e. g.*, *Zellan v. Cole*, 87 U.S.App.D.C. 9, 183 F.2d 139 (1950) (meaning of contract ascertained by considering actions of parties); *Fox v. Johnson & Wimsatt, Inc.*, 75 U.S.App.D.C. 211, 219, 127 F.2d 729, 735–736 (1942) (interpretation of corporate resolution supported by actions of parties); *United Steelworkers of America v. Northwest Steel Rolling Mills, Inc.*, 324 F.2d 479, 482 (9th Cir. 1963) (interpretation guided by subsequent acts or words of parties), and the parties' interpretation here appears to us to be a reasonable one. Similarly, the requirements of provision four of the agreement plainly have been met in the instant case. See J.App. 154. And the mandate of provision six has been substantially satisfied, *id.*, thus mooting any necessity for an injunction with respect to the Munsey Building.

with the Historic Protection Act, however, calls for a rather extensive discussion. The District Court gave this brief explanation for that ruling:

> The District of Columbia has ... interpreted that statutory provision as being inapplicable to the Munsey Building. The District of Columbia's interpretation of its responsibilities under the statute is reasonable and is concurred in by PADC. Although other interpretations of the statutory provision may be possible, since the District of Columbia's interpretation is reasonable it cannot be set aside by the Court.[50]

This statement obviously was a reference to a written opinion, furnished by the District's Corporation Counsel while PADC's permit application was under consideration,[51] expressing the view that the District law did not apply to demolition of the Munsey and other buildings in Square 254.[52] As a federal court unable to authoritatively render interpretations of local statutes,[53] however, we prefer to rest our decision on a more comfortable foundation.[54]

■ The parties and the amicus have concentrated the arguments pro and con largely on Sections 7(a) and 9(b) of the PADC Act. The latter provision requires

---

Appellant has also failed to demonstrate the need for a prospective order requiring future compliance with the agreement. The District Court found it unnecessary to issue injunctive relief despite the alleged "pattern and practice" of contract breach, *Don't Tear It Down v. Pennsylvania Ave. Dev. Corp., supra* note 41, memorandum and order (Nov. 6, 1979), J.App. 154; while federal courts surely have the power to grant injunctions when a substantial danger of future violations exists, a sufficient showing has not been made that the District Court abused its discretion. See *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 60–62, 95 S.Ct. 2069, 2077–2078, 45 L.Ed.2d 12, 22–23 (1975); *Hecht Co. v. Bowles*, 321 U.S. 321, 329–330, 64 S.Ct. 587, 591–592, 88 L.Ed. 754, 760–761 (1944) (district court's equity jurisdiction characterized by "[f]lexibility rather than rigidity"); *NLRB v. Express Publishing Co.*, 312 U.S. 426, 435–436, 61 S.Ct. 693, 699, 85 L.Ed. 930, 937 (1941) ("the mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute").

50. *Don't Tear It Down v. Pennsylvania Ave. Dev. Corp., supra* note 41, memorandum and order (Nov. 6, 1979), J.App. 153–154.

51. See note 37 *supra* and accompanying text.

52. See Memorandum from Judith M. Rogers, Corporation Counsel, to Robert L. Moore, Director, Department of Housing and Community Development (Sept. 24, 1979), J.App. 278–282. The pivotal language of the opinion is:

> A more reasonable interpretation of the language is that in the formulation of the Plan [PADC], while establishing a general redevelopment standard for Square 254, recognized the economic interests involved, and did not require redevelopment of the Munsey Building site. Implicit in that language is that retention of the Munsey Building was consistent with the Plan only so long as its

owners chose not to redevelop it. Denial of the application for a demolition permit at this time, thus, would be inconsistent with the Plan.

> It is my conclusion, therefore, that the five instant applications for demolition permits are not subject to D.C.Law 2–144.

J.App. 281–282.

53. *E. g., Alabama State Fed'n of Labor Local 103 v. McAdory*, 325 U.S. 450, 471, 65 S.Ct. 1384, 1394, 89 L.Ed. 1725, 1740 (1945); *Union Pac. R. R. v. Board of Comm'rs*, 247 U.S. 282, 287, 38 S.Ct. 510, 512, 62 L.Ed. 1110, 1117 (1918).

54. We react similarly with respect to another facet of this case. Under rules of procedure adopted pursuant to the D.C. Historic Protection Act, a certification by PADC that denial of a demolition permit will lead to a departure from the development plan authorizes the Mayor to waive application of the Act upon his independent determination that PADC is correct. 26 D.C.Reg. 263, 272 (1979); see J.App. 280. Such action was taken in this case. J.App. 284. While appellant asserts that giving force to the Mayor's conclusion would be tantamount to deferring to a local interpretation of federal law, we note that under certain circumstances a locality may incorporate federal statutes into its own legislation–and a case may not arise under federal law when a locality conditions a local duty on standards declared in congressional enactments. Hence the requirements of local law may in fact have been satisfied in this case. Cf. *Moore v. Chesapeake & O. Ry.*, 291 U.S. 205, 214–215, 54 S.Ct. 402, 406, 78 L.Ed. 755, 762 (1934) (state cause of action defined in terms of federal standards does not present a federal question cognizable in federal courts absent diversity of citizenship). Because the District of Columbia regulations have not been authoritatively interpreted, however, we do not rely on this point.

PADC to "comply with all District of Columbia laws, ordinances, codes, and regulations in constructing, reconstructing, rehabilitating, altering, and improving any project."[55] It is evident at the outset, however, that this case cannot be satisfactorily resolved by looking at Section 9(b) alone. While statutory words are to be accorded their ordinary meaning absent indication of a contrary legislative intent[56]—and while it would appear that demolition may properly be deemed a step in "rehabilitating"[57]—statutory meaning is of course to be derived, not from the reading of a single sentence or section, but from consideration of an entire enactment against the backdrop of its policies and objectives.[58] Yet Section 7(a) reminds us that federal agencies and the District of Columbia must act "consistent[ly] with the development plan or the provisions and purposes of the" PADC Act,[59] and that neither may "release, modify, or depart from any feature or detail of the development plan without the approval of" PADC.[60] Given our duty to reconcile potentially discordant provisions of a statute

whenever possible,[61] we cannot read Section 9(b) as requiring compliance with a local demolition regulation that might frustrate any aspect of the Pennsylvania Avenue area development plan.

We thus are steered inexorably to consideration of two questions: Is the District's Historic Protection Act inconsistent with the plan in the sense that it would work some "departure from" some "feature or detail" thereof? Is the Historic Protection Act harmonious with "the provisions and purposes of the" PADC Act? Concepts deeply imbedded in our jurisprudence assume critical significance in our search for answers.

## IV

Our Constitution declares federal legislation, when compatible therewith, to be the supreme law of the land.[62] Federal statutes thus prevail over local regulations when the two collide or are otherwise inconsistent in their effects.[63] Correlatively, con-

**55.** PADC Act § 9(b), 40 U.S.C. § 878(b) (1976).

**56.** *Burns v. Alcala*, 420 U.S. 575, 580–581, 95 S.Ct. 1180, 1184, 43 L.Ed.2d 469, 475 (1975); *Banks v. Chicago Grain Trimmers Ass'n*, 390 U.S. 459, 465, 88 S.Ct. 1140, 1144, 20 L.Ed.2d 30, 36 (1968); *Malat v. Riddell*, 383 U.S. 569, 571-572, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102, 104 (1966); *March v. United States*, 165 U.S. App.D.C. 267, 276, 506 F.2d 1306, 1315 (1974).

**57.** Appellant does not challenge PADC's statutory authority to demolish, but only the validity of the demolition permit the District of Columbia is ready to issue.

**58.** See *Philbrook v. Glodgett*, 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525, 532–533 (1975); *Kokoszka v. Belford*, 417 U.S. 642, 645, 94 S.Ct. 2431, 2433, 41 L.Ed.2d 374, 378–379 (1974); *Richards v. United States*, 369 U.S. 1, 11, 82 S.Ct. 585, 591–592, 7 L.Ed.2d 492, 499 (1962); *NLRB v. Lion Oil Co.*, 352 U.S. 282, 288, 77 S.Ct. 330, 334, 1 L.Ed.2d 331, 337 (1957); *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 285, 76 S.Ct. 349, 359, 100 L.Ed. 309, 321 (1956).

**59.** See text *supra* at note 16.

**60.** See text *supra* at note 16.

**61.** *FPC v. Panhandle E. Pipe Line Co.*, 337 U.S. 498, 514, 69 S.Ct. 1251, 1260, 93 L.Ed. 1499,

1509 (1949); *Montgomery Charter Serv., Inc. v. Washington Metropolitan Area Transit Comm'n*, 117 U.S.App.D.C. 34, 38, 325 F.2d 230, 234 (1963); *Fisher v. District of Columbia*, 82 U.S.App.D.C. 371, 372-373, 164 F.2d 707, 708–709 (1948); cf. *Maiatico v. United States*, 112 U.S.App.D.C. 295, 301, 302 F.2d 880, 886 (1962).

**62.** U.S.Const., art. VI, cl. 2, the Supremacy Clause, specifies that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

**63.** *E. g.*, *Kleppe v. New Mexico*, 426 U.S. 529, 543, 545, 96 S.Ct. 2285, 2293, 2294, 49 L.Ed.2d 34, 45, 46 (1976); *United States v. Georgia Pub. Serv. Comm'n*, 371 U.S. 285, 292–293, 83 S.Ct. 397, 402, 9 L.Ed.2d 317, 322–323 (1963); *Morris v. Jones*, 329 U.S. 545, 553, 67 S.Ct. 451, 457, 91 L.Ed. 488, 497 (1947); *Florida v. Mellon*, 273 U.S. 12, 17, 47 S.Ct. 265, 266, 71 L.Ed. 511, 514–515 (1927). Of course, a need to resolve a conflict arises only when federal and local legislative powers exist concurrently, as more usually they do. But state power in a given area may be restricted by constitutional considerations, *e. g.*, *United States v. Pink*, 315 U.S. 203, 232–233, 62 S.Ct. 552, 566–567, 86 L.Ed.

stitutionally–grounded federal operations may not–absent congressional consent–be thwarted by local fiat.[64] The judicial function is to ascertain whether federal and local exertions can be reconciled and, when that proves impossible, to give force to the federal activity.[65]

Our task therefore necessitates a close examination of the federal program before us.[66] In its essentials, the PADC, a federal instrumentality, has decided to raze the federally–owned Munsey Building,[67] and to lease the site as part of the federal effort to revitalize Pennsylvania Avenue. Yet the District of Columbia's Historic Protection Act, if applicable, will prevent demolition unless a permit is obtained from the Mayor.[68] It is manifest from the record that

should a permit be denied, the rehabilitation plan for an entire square will be frustrated.[69] The question, then, is whether consummation of this federal project can properly be made subject to the Mayor's approval.

■ In situations where federal and local enactments overlap in their effects on non-governmental activities, the Supreme Court has consistently reminded us that, to the extent possible, "the proper approach is to reconcile 'the operation of both statutory schemes with one another rather than holding one completely ousted.'"[70] The Court has taken a different tack, however, in cases involving local laws that impact directly on federal operations,[71] on the man-

---

796, 819–820 (1942), or by Congress–either explicitly, *e. g., Hamm v. City of Rock Hill*, 379 U.S. 306, 310–312, 85 S.Ct. 384, 388–389, 13 L.Ed.2d 300, 304–305 (1964), or because federal legislation fully occupies the field, *e. g., City of Burbank v. Lockheed Air Terminal*, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973). Once exclusive federal power is found, parallel state law is necessarily without effect. See cases cited *supra.*

**64.** See cases cited *infra* notes 71–73.

**65.** Judicial responses to this obligation have nurtured the hoary and still–developing doctrine of preemption. See generally Note, *A Framework for Preemption Analysis*, 88 Yale L.J. 303 (1978); Note, *The Preemption Doctrine: Shifting Perspectives on Federalism and the Burger Court*, 75 Colum.L.Rev. 623 (1975); Abrams & Abrams, *Goldstein v. California: Sound, Fury and Significance*, 1975 Sup.Ct.Rev. 147; Hirsch, *Toward a New View of Federal Preemption*, 1972 U.Ill.L.F. 515; Note, *Preemption As a Preferential Ground: A New Canon of Construction*, 12 Stan.L.Rev. 208 (1959). The great bulk of the litigation has involved overlapping federal and state statutes. We need not undertake precise definition of the governmental status of the District of Columbia, see note 33 *supra*, for surely the preemption doctrine effects District of Columbia legislation no less than state enactments. *Cf. Firemen's Ins. Co. v. Washington*, 157 U.S.App. D.C. 320, 325–328, 483 F.2d 1323, 1328–1331 (1973); *Maryland & D. C. Rifle & Pistol Ass'n v. Washington*, 142 U.S.App.D.C. 375, 381–384, 442 F.2d 123, 129–132 (1971); *French v. District of Columbia*, 32 App.D.C. 106, 108 (1908); *Taylor v. District of Columbia*, 24 App.D.C. 392, 404 (1904).

**66.** "While federal pre–emption of [local] statutes is, of course, ultimately a question under the Supremacy Clause, ... analysis of pre–emption issues depends primarily on statutory and not constitutional interpretation." *Philadelphia v. New Jersey*, 430 U.S. 141, 142, 97 S.Ct. 987, 988, 51 L.Ed.2d 224, 226 (1977).

**67.** See text *supra* at note 30.

**68.** See text *supra* at note 32. Compare *Hancock v. Train*, 426 U.S. 167, 180, 96 S.Ct. 2006, 2013, 48 L.Ed.2d 555, 556 (1976).

**69.** See text *supra* at notes 25–36.

**70.** *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 127, 94 S.Ct. 383, 389–390, 38 L.Ed.2d 348, 359 (1973), quoting *Silver v. New York Stock Exchange*, 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389, 400 (1963). In a series of recent cases dealing with occupation of the legislative field, the Court has made clear its conviction that federal and local enactments should as a rule be accommodated. See, *e. g., Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 132, 98 S.Ct. 2207, 2216, 57 L.Ed.2d 91, 104 (1978); *De Canas v. Bica*, 424 U.S. 351, 357–358 n.5, 96 S.Ct. 933, 937 n.5, 47 L.Ed.2d 43, 50 n.5 (1973); *New York State Dep't of Social Servs. v. Dublino*, 413 U.S. 405, 413–414, 93 S.Ct. 2507, 2513, 37 L.Ed.2d 688, 695 (1973); *Goldstein v. California*, 412 U.S. 546, 567–569, 93 S.Ct. 2303, 2315–2316, 37 L.Ed.2d 163, 180–181 (1973).

**71.** *Sperry v. Florida*, 373 U.S. 379, 383–385, 83 S.Ct. 1322, 1325, 10 L.Ed.2d 428, 431–433 (1963) (state cannot require bar membership by nonlawyer, authorized pursuant to federal statute to practice before Patent Office, as condition to his within–state activities directly relat-

agement of federal installations,[72] or on the use of federal property, where considerations of sovereignty come into play.[73] Insofar as such laws substantially impede federal activities or directly place "a prohibition on the federal government,"[74] the Court has treated them as presumptively invalid under the Supremacy Clause:[75] "where 'Congress does not affirmatively declare its instrumentalities or property subject to regulation,' 'the federal function must be left free' of regulation."[76]

■ This is not to say that federal programs or properties are necessarily insulat-

ed to such practice); *Public Utils. Comm'n v. United States*, 355 U.S. 534, 540–546, 78 S.Ct. 446, 451–454, 2 L.Ed.2d 470, 475–478 (1958) (sustaining injunction against state statute requiring state commission's prior approval of federal practice of negotiation of special rates for shipments of governmental property); *Mayo v. United States*, 319 U.S. 441, 445, 63 S.Ct. 1137, 1139, 87 L.Ed. 1504, 1507–1508 (1943) (state cannot require payment of an inspection fee before it permits distribution of fertilizer owned by the United States); *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190, 77 S.Ct. 257, 258–259, 1 L.Ed.2d 231, 233 (1956) ("[s]ubjecting a federal contractor to the [state] *contractor license requirements would give the* State's licensing board a virtual power of review over the federal determination of 'responsibility' and would thus frustrate the expressed federal policy of selecting the lowest responsible bidder"); *Johnson v. Maryland*, 254 U.S. 51, 55–57, 41 S.Ct. 16, 17, 65 L.Ed. 126, 128–129 (1920) (postal employee operating truck in line of duty cannot be required to obtain a state license; "[s]uch a requirement does not merely touch the Government servants remotely by a general rule of conduct; it lays hold of them in their specific attempt to obey orders and requires qualifications in addition to those that the Government has pronounced sufficient," *id.* at 57, 41 S.Ct. at 17, 65 L.Ed. at 128–129); *Ohio v. Thomas*, 173 U.S. 276, 281–284, 19 S.Ct. 453, 454–455, 43 L.Ed. 699, 700–701 (1899) (governor of a soldiers' home cannot be subjected to state regulation respecting use of oleomargarine before furnishing it to inmates of the home). The potency of the supremacy doctrine is reflected in *Johnson v. Maryland, supra*, by the Court's description of *In re Neagle*, 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1890), as a holding that "even the most unquestionable and most universally applicable of state laws, such as those concerning murder, will not be allowed to control the conduct of a marshal of the United States acting under and in pursuance of the laws of the United States." 254 U.S. at 56–57, 41 S.Ct. at 16, 65 L.Ed. at 128–129.

**72.** *Hancock v. Train, supra* note 68, 426 U.S. at 178–179, 96 S.Ct. at 2012–2013, 48 L.Ed.2d at 565–566 (state whose federally–approved implementation plan prohibits operation of air-polluting source without a state permit cannot require federally–owned or –operated installations to secure such permit); *EPA v. California*

*ex rel. State Water Resources Control Bd.*, 426 U.S. 200, 211–228, 96 S.Ct. 2022, 2028–2035, 48 L.Ed.2d 578, 587–596 (1976) (federal installations discharging water pollutants in a state having a federally–approved permit program not required to obtain such permits).

**73.** *E. g., Kleppe v. New Mexico, supra* note 63, 426 U.S. at 540, 96 S.Ct. at 2292, 49 L.Ed.2d at 43–44; *United States v. San Francisco*, 310 U.S. 16, 29–30, 60 S.Ct. 749, 756, 84 L.Ed. 1050, 1059–1060 (1940). Indeed, the Property Clause, U.S.Const., art. IV, § 3, cl. 2, which confers on Congress "Power to dispose of and make all needful Rules and Regulations respecting the . . . Property belonging to the United States," provides a specific and independent constitutional basis for congressional action respecting federal property. Such "federal legislation necessarily overrides conflicting state laws under the Supremacy Clause." *Kleppe v. New Mexico, supra* note 63, 426 U.S. at 542–543, 96 S.Ct. at 2293, 49 L.Ed.2d at 45. The Property Clause undoubtedly applies to both the Munsey Building and its landsite–for the definition accorded "property" is broad, see, *e. g., Ashwander v. TVA*, 297 U.S. 288, 330–340, 56 S.Ct. 466, 475–480, 80 L.Ed. 688, 701–707 (1936) (electrical energy potentially made available by construction of dam was property the United States was entitled to reduce to possession), and Congress was free to delegate its power over them to the PADC. See, *e. g., United States v. Heinszen & Co.*, 206 U.S. 370, 384–385, 27 S.Ct. 742, 745–746, 51 L.Ed. 1098, 1103 (1907) (delegation to the President); *United States v. Cassiagnol*, 420 F.2d 868, 876–877 (4th Cir.), *cert. denied*, 397 U.S. 1044, 90 S.Ct. 1364, 25 L.Ed.2d 654 (1970) (delegation to Government Services Administration).

**74.** *Hancock v. Train, supra* note 68, 426 U.S. at 180, 96 S.Ct. at 2013, 48 L.Ed.2d at 556, quoting *California Pub. Util. Comm'n v. United States*, 355 U.S. 534, 544, 78 S.Ct. 446, 453, 2 L.Ed.2d 470, 477 (1958).

**75.** See note 62 *supra*.

**76.** *Hancock v. Train, supra* note 68, 426 U.S. at 179, 96 S.Ct. at 2012–2013, 48 L.Ed.2d at 565, quoting *Mayo v. United States, supra* note 71, 319 U.S. at 447–448, 63 S.Ct. at 1140–1141, 87 L.Ed. at 1508–1509.

ed from incidental or nonburdensome local requirements.[77] And Congress may, of course, subordinate federal projects and property to local governance of a type not otherwise permissible,[78] as indeed to some extent it has done here.[79] But at least where local control over federal activity would obstruct achievement of an explicit congressional objective, "an authorization of [local] regulation is found only when and to the extent there is 'a clear congressional mandate,' 'specific congressional action' that makes this authorization of [local] regulation 'clear and unambiguous.'"[80] In light of the ambiguity created by the conflicting signals given by Sections 7(a) and 9(b), we find no such clarity here.

## V

While Congress opened the door to some local regulation in the Pennsylvania Avenue development area,[81] it plainly envisioned the resuscitation of the Pennsylvania Avenue area progressing in strict conformity with specifications to be set forth in a development plan deemed workable by PADC and found acceptable by Congress. Thus the Act called upon PADC to prepare such a plan,[82] it listed a number of topics to be addressed,[83] it particularized the procedure for assembly of the plan,[84] and it required submission of the plan to both Houses of Congress for scrutiny and possible disapproval.[85] Beyond that, as has been noted the Act admonished that "[a]ctivities under the development plan shall be carried out in accordance with the approved development plan," [86] and that any "substantial change" therefrom must run the same procedural gamut prescribed for original provisions.[87] Correspondingly, the Act permits other agencies to exercise their powers in the development area only to the extent "consistent with the development plan or the provisions or purposes of" the Act,[88] and emphasizes that "no such agency or instrumentality shall release, modify, or depart from any feature or detail of the development plan without the prior approval of"

**77.** *Kleppe v. New Mexico, supra* note 63, 426 U.S. at 543, 96 S.Ct. at 2293, 49 L.Ed.2d at 45–46 (state retains jurisdiction over federal lands insofar as its regulations do not conflict with federal enactments); *Evansville–Vanderburgh Airport Auth. v. Delta Airlines,* 405 U.S. 707, 720–721, 92 S.Ct. 1349, 1357, 31 L.Ed.2d 620, 631 (1972) ("use and service charge" of $1 for each passenger deplaning from a commercial aircraft imposable for maintenance and improvement of airport); *Wilson v. Cook,* 327 U.S. 474, 486–488, 66 S.Ct. 663, 669–670, 90 L.Ed. 793, 802–803 (1946) (state tax imposable on lumber–severance from federal land); *Johnson v. Maryland, supra* note 71, 254 U.S. at 56, 41 S.Ct. at 16, 65 L.Ed. at 128–129 (postal employees may have to obey ordinary traffic laws).

**78.** *E. g., Mayo v. United States, supra* note 71, 319 U.S. at 446, 63 S.Ct. at 1140, 87 L.Ed. at 1508; *Pacific Coast Dairy, Inc. v. Department of Agriculture,* 318 U.S. 285, 296, 63 S.Ct. 628, 631, 87 L.Ed. 761, 767 (1943); *Owensboro Nat'l Bank v. Owensboro,* 173 U.S. 664, 668–669, 19 S.Ct. 537, 538, 43 L.Ed. 850, 852 (1899).

**79.** See text *supra* at note 55.

**80.** *Hancock v. Train, supra* note 68, 426 U.S. at 179, 96 S.Ct. at 2012–2013, 48 L.Ed.2d at 565, first quoting *Kern–Limerick, Inc. v. Scurlock,* 347 U.S. 110, 122, 74 S.Ct. 403, 411, 98 L.Ed. 546, 556–557 (1954), next quoting *Paul v. United States,* 371 U.S. 245, 263, 83 S.Ct. 426, 437,

9 L.Ed.2d 292, 304 (1963), and last quoting *California ex rel. State Water Resources Control Bd. v. EPA,* 511 F.2d 963, 968 (9th Cir. 1975), *rev'd on other grounds,* 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976). *Hancock* neatly illustrates this proposition by its holding that federal installations–though statutorily compelled to comply with state "requirements respecting control and abatement of air pollution"–need not obtain the operating permits specified by state law, 426 U.S. at 190, 96 S.Ct. at 2018, 48 L.Ed.2d at 571–572.

**81.** See text *supra* at note 55.

**82.** PADC Act § 5, 40 U.S.C. § 874 (1976).

**83.** *Id.* § 5(a), 40 U.S.C. § 874(a) (1976).

**84.** *Id.* § 5(b)–(d), 40 U.S.C. § 874(b)–(d) (1976).

**85.** *Id.* § 5(d), 40 U.S.C. § 874(d) (1976).

**86.** *Id.* § 5(e), 40 U.S.C. § 874(e) (1976).

**87.** *Id.* "Substantial change" includes "one which, in the opinion of the Secretary of the Interior, affects his responsibilities for the administration, protection, and development of the areas within the Pennsylvania Avenue National Historic Site." *Id.*

**88.** *Id.* § 7(a), 40 U.S.C. § 876(a) (1976).

PADC.[89] Since the congressionally–approved development plan specified that the owner of the Munsey Building would be at liberty to retain or to demolish it,[90] a local statute restricting this freedom would appear to conflict with the plan. A procedure whereby local authority may bar a demolition which Congress left fully optional can hardly be characterized otherwise than as a "depart[ure] from [a] feature or detail of the development plan ...." Thus appellant's observation that the plan does not on its face *require* demolition of the Munsey Building is simply irrelevant.

There is *another* formidable obstacle to concurrent operation of the two laws. The federal enactment directed PADC to "give primary consideration to local needs and desires" in formulating the development plan,[91] and mandated such an extensive representation of and participation by the locality in the process as to make it unlikely indeed that Congress intended their repetition at the local level. PADC's fifteen–member board of directors had to include the Mayor[92] and the Chairman of the Coun-

cil[93] of the District of Columbia or their respective designees,[94] and at least four District residents who were registered voters.[95] The Chairman of the District's Commission on Fine Arts[96] and the Director of its Department of Housing and Community Development[97] had to be invited to serve as two of eight nonvoting members. Additionally, the PADC Act established a nonvoting advisory board of seven tenants and owners of real property within the development area to meet at least twice annually with the board, and "otherwise offer such advice and assistance as may be of benefit to the [board] during preparation of the development plan."[98]

Even more importantly, the plan had to be prepared in cooperation with the District of Columbia Government[99] and thereafter submitted to the Mayor,[100] who in turn was directed to hold public hearings on the plan and to notify PADC of his approval or recommended modifications.[101] If such recommendations were made, PADC had to consult with the Mayor respecting them,[102]

---

**89.** *Id.* (emphasis supplied). The essentially federal nature of the plan is corroborated by various sections of the PADC Act that grant PADC substantial discretion. Thus PADC is elsewhere empowered to "acquire lands, improvements, and properties within the development area by purchase, lease, donation, or exchange," PADC Act, § 6(6), 40 U.S.C. § 875(6) (1976); it may resort to "condemnation proceedings" under the District of Columbia Code "for the acquisition of real property (including interest [*sic*] therein), which may be necessary or appropriate in order to carry out the development plan," *id.*; and it may also "sell, lease, or otherwise dispose of such real and personal property and any interest therein as [it] deems necessary to carry out the development plan," *id.* Even more generously, the PADC Act provides that "[i]n carrying out its powers and duties," PADC has "all necessary and proper powers for the exercise of the authorities vested in it." *Id.* § 6(1), 40 U.S.C. § 875(1) (1976). These already broad grants of authority, compare *In re Pub. Serv. Coordinated Transp.*, 103 N.J.Super. 505, 247 A.2d 888, 891 (1968) ("necessary and proper"); *Le Force v. Bullard*, 454 P.2d 297, 301 (Okl.1969) (same); *Preston County Coke Co. v. Elkins Coal & Coke Co.*, 82 W.Va. 590, 96 S.E. 973, 975 (1918) (same), must be viewed in light of the fact that one of the reasons for the decline of the Pennsylvania Avenue area was "the lag of private development, resulting from the difficult, if not impos-

sible, task for private investors to aggregate parcels of land and sites large enough for profitable investment." House Report, *supra* note 6, at 12.

**90.** See text *supra* at note 23.

**91.** PADC Act § 9(a)(2), 40 U.S.C. § 878(a)(2) (1976).

**92.** *Id.* § 3(c)(6), 40 U.S.C. § 872(c)(6) (1976).

**93.** *Id.* § 3(c)(7), 40 U.S.C. § 872(c)(7) (1976).

**94.** *Id.* § 3(d), 40 U.S.C. § 872(d) (1976).

**95.** *Id.* § 3(c)(8), 40 U.S.C. § 872(c)(8) (1976).

**96.** *Id.* § 3(g)(7), 40 U.S.C. § 872(g)(7) (1976).

**97.** *Id.* § 3(g)(8), 40 U.S.C. § 872(g)(8) (Supp. II 1978).

**98.** *Id.* § 3(j), 40 U.S.C. § 872(j) (1976).

**99.** *Id.* § 5(b), 40 U.S.C. § 874(b) (1976).

**100.** *Id.* § 5(c), 40 U.S.C. § 874(c) (1976).

**101.** *Id.*

**102.** *Id.* § 5(d), 40 U.S.C. § 874(d) (1976).

and they were to be transmitted to Congress.[103] Even outside the mainstream of plan–preparation and –refinement, PADC was required to "consult and cooperate with District of Columbia officials," [104] and "foster local initiative and participation in connection with the planning and development of its projects." [105] It cannot be gainsaid that this elaborate machinery furnishes a respectable forum for ventilation of any local problem associated with reclamation of the Pennsylvania Avenue area. And we find it correspondingly unlikely that Congress, having created such an elaborate mechanism, intended to allow for the exercise of duplicative local procedures. Pennsylvania Avenue–the Nation's "Main Street" [106]–is the concern of all Americans; we are not persuaded that Congress relegated the national interest to the uncertainties of local decisionmaking.[107]

We therefore think it extremely dubious that the PADC Act left room for the District's Historic Protection Act to function with respect to the Munsey Building.[108] We are certain that, at the very least, there is no "clear congressional mandate" to make an authorization of local regulation "clear and unambiguous." [109] The judgment appealed from is accordingly

*Affirmed.*

---

**103.** *Id.*

**104.** *Id.* § 9(a)(1), 40 U.S.C. § 878(a)(1) (1976).

**105.** *Id.* § 9(a)(3), 40 U.S.C. § 878(a)(3) (1976).

**106.** See House Report, *supra* note 6, at 12.

**107.** The standard for local action on PADC's demolition application, we repeat, is whether "the permit is necessary in the public interest or [whether] failure to issue a permit will result in unreasonable economic hardship to the owner." D.C. Historic Protection Act, § 5(e), 25 D.C.Reg. at 6947.

**108.** See Part III *supra.*

**109.** See text *supra* at note 80.