Argued and submitted December 2, 1982, reversed and remanded April 19, 1983

## PHILIPPI et al,
*Respondents on Review,*
*v.*
## CITY OF SUBLIMITY,
*Petitioner on Review.*

(LUBA 81-078, CA A23238, SC 28990)

662 P2d 325

James D. Tiger, Stayton, argued the cause for petitioner on review. With him on the brief and petition was Duncan & Tiger, Stayton.

M. Chapin Milbank, Salem, argued the cause for respondents on review. With him on the brief was Schlegel, Milbank, Jarman & Hilgemann, Salem.

Before Lent, Chief Justice, Linde, Peterson, Campbell and Roberts, Justices.

ROBERTS, J.

**ROBERTS, J.**

Both the City of Sublimity and the Land Use Board of Appeals (LUBA) denied respondents' application for a subdivision development permit for their property zoned single family residential (SFR) in the zoning ordinance and designated "single family" in the Sublimity Comprehensive Plan. This denial was based upon, *inter alia,* an "agricultural retention policy" set out in the city's acknowledged comprehensive plan. The Court of Appeals held that such a policy cannot be employed to defeat development of residentially zoned property within an acknowledged urban growth boundary (UGB) and reversed. 59 Or App 295, 650 P2d 1038 (1982). We accepted review to determine whether Sublimity may delay development of properties within the UGB which are designated "single-family" in the comprehensive plan and zoned SFR, based upon an expressed comprehensive plan policy in favor of preserving agricultural land until needed for urban purposes.

The City of Sublimity's comprehensive plan, with its concomitant zoning and subdivision ordinances, was acknowledged by the Land Conservation and Development Commission (LCDC) in April, 1980. ORS 197.251. This acknowledged package demarcates the city's UGB and designates a particular zoning classification for all properties within that boundary. There are various zone classes, but all of them are urban in nature; there is none akin to an "agricultural" zone.

Respondents' property, the parcel here at issue, is within the UGB at the extreme northeast edge of the city. It is abutted on several sides by properties in residential use and is itself zoned SFR. The parcel is presently undeveloped and was until recently in active agricultural production. In early 1981, respondent applied for a permit to develop the parcel, which comprises roughly ten acres, into a 34-lot residential subdivision. Although such a use is compatible with the parcel's SFR zone, the city after a public hearing denied respondent's request and adopted findings in justification of the denial. *See Philippi v. City of Sublimity,* 4 Or LUBA 291, 293-294 (1981). These findings indicate that the city's decision was, in part, based upon an "agricultural retention policy" set out in its comprehensive

plan, which policy favors preservation of productive farm land within the UGB until such time as it is needed for urban purposes.[1]

---

[1] Sublimity's "agricultural retention policy" finds its expression in several locations in the city's comprehensive plan, a document written largely in essay format. Specifically, in Chapter IV, entitled "Natural Resources," it states:

*"Agricultural Lands and Open Space*

"Agriculture is of major importance to the Sublimity area. The lands surrounding the City are currently in agricultural use as pastures and for grains and grass seeds, and are classified as either Class II or III soils. The City recognizes this resource and seeks to preserve this land in its natural open state as a means of maintaining the rural atmosphere for which the town is named. Land which is inside the City limits and the urban growth boundary that is in agricultural use shall remain in agricultural use until it is needed for urbanization and can be provided with urban facilities."

In Chapter VIII, "Land Use Element":

*"Residential Land Use*

"GOALS: PROVIDE SUFFICIENT AREAS FOR FUTURE RESIDENTIAL LAND USES TO MEET THE NEEDS OF THE COMMUNITY.

"ESTABLISH A RESIDENTIAL LAND USE PATTERN WHICH REDUCES THE SCATTERIZATION OF FUTURE DEVELOPMENTS.

"ESTABLISH RESIDENTIAL AREAS THAT ARE PLEASANT, HEALTHY AND SAFE PLACES IN WHICH TO LIVE.

"PRESERVE THE RURAL QUALITY OF EXISTING RESIDENTIAL DEVELOPMENT.

"* * * * *

"The most striking aspect of Sublimity's residential land is the open feeling one derives from the rural character of the community. The citizens of Sublimity are well aware of the rural character of the City, and do not desire future development to alter it.

*"Encourage the location of housing to minimize the consumption of prime agricultural land and other areas of natural resource that contribute to the community's character.*

"* * * * *

*"Open Space*

"GOAL: PRESERVE OPEN SPACE AREA TO ENHANCE THE QUALITY OF LIFE AND PROTECT NATURAL RESOURCES.

"As has been previously discussed, Sublimity has an abundance of existing open space. Most of this open space is currently in agricultural use. Agricultural uses have, in other locations, created conflicts with residential and other urban uses. However, it appears that major problems have not developed in the past in Sublimity. In fact, the City feels that these agricultural uses add to the character and comfortable life style in Sublimity.

"It is a foregone conclusion, though, that eventually urbanization pressures will necessitate the conversion of these agricultural uses to urban uses.

Respondents petitioned LUBA for review of the decision[2] challenging both the sufficiency of the evidence upon which the city based its findings and the propriety of imposing on respondents' subdivision request the agricultural retention policy. LUBA remanded the dispute back to the city for reconsideration and the adoption of more complete findings. *Id.* In so ruling, however, LUBA rejected respondents' contention that it was improper for the city to apply an agricultural retention policy to bar or delay development of residentially zoned property within the UGB. *Id.,* at 299-300.

Respondents appealed to the Court of Appeals and cited as error only the latter aspect of LUBA's decision; the city did not cross-appeal. On the narrow issue thus presented, the court reasoned:

"Only those general policies contained in the comprehensive plan that are consistent with the plan designation and zoning classification may be used at the subdivision approval stage to regulate development of urbanizable land. It must be conclusively presumed that general policies stated in the comprehensive plan have been considered and found inapplicable by the time property is zoned for a use that is inconsistent with the general policy. That is to say, the general policy to preserve land presently in agricultural use for that use must have been considered and found inapplicable when it was zoned for single-family residential use. It may be that there are other impediments to approval of this subdivision that are properly governed by specific requirements contained in the subdivision ordinance, or that other general policies can be validly applied in such a way as to require modification of the proposed

---

The city is cognizant of this fact, but desires urbanization to occur in an orderly fashion. The following policies have been adopted, concerning open space:

"*Discourage the premature and wasteful conversion of valuable agricultural land to city uses.*

"*Ensure available space for varying land uses through the provision of agricultural uses as interim open spaces.*" City of Sublimity's Comprehensive Plan, pp. 11, 33-34, and 38 (1979) (emphasis in original.)

[2] The statutes governing the right to LUBA review of a local "land use decision" appear in Oregon Laws, 1979, chapter 772, as amended by Oregon Laws, 1981, chapter 748. *See City of Pendleton v. Kerns,* 294 Or 126, 653 P2d 992 (1982).

development or to postpone it. But that is not the question here."³ 59 Or App at 301 (footnote omitted).

And concluded: "We hold only that a general policy in a comprehensive plan favoring retention of agricultural land within an acknowledged UGB may not be applied to preclude development on land designated and zoned for residential use." *Id.* at 302. The court then reversed and remanded the case to LUBA.

■ ■ Analysis here must be prefaced with the recognition that a local government's comprehensive plan holds the preeminent position in its land use powers and responsibilities. Zoning and subdivision ordinances, and local land use decisions, are intended to be the means by which the plan is effectuated and, to such an extent, they are subservient to the plan. *Baker v. City of Milwaukie,* 271 Or 500, 533 P2d 772 (1975); *see* ORS 92.044(6) and ORS 197.175(2)(d). Accordingly, a particular zoning designation does not of itself entitle the landowner to a particular corresponding use irrespective of whether applicable provisions of the plan may mandate otherwise.⁴ The question thus presented is whether the challenged "agricultural retention policy" is applicable to the subject parcel and whether it permits the city to delay the parcel's development.

---

³ As noted by the Court of Appeals, 59 Or App at 297-298, the city's decision to deny respondent's subdivision application was also based on other developmental policies found in the plan — *viz.,* the retention of open space, the discouragement of "leap-frog" development, and the lessening of the burden on public facilities such as schools, existing traffic corridors, and sewage systems. LUBA held that the city's findings were inadequate to support its decision under these policies, too. However, since only LUBA's decision with regard to the agricultural retention policy has been appealed, we, as did the Court of Appeals, express no opinion as to the effect or validity of these other policies.

⁴ The subordinance of the zoning classification to the comprehensive plan is reflected in Sublimity's subdivision ordinance, section 6.01:

"*SECTION 6.01. CONSIDERATIONS FOR APPROVAL OR DENIAL* When considering the appropriateness of a subdivision or partitioning application the commission *will consider whether or not it is in accordance with the provisions and intent of the Sublimity Comprehensive Plan,* if it is necessary and proper for the orderly growth of Sublimity, or if it is in accordance with the intent and regulations set forth in this ordinance. In reviewing an application, the commission may prescribe conditions or make changes or modifications to the plan it feels are necessary to promote proper and orderly development of the community. If the commission finds that the application is not consistent with any or all of the provisions set forth above, the commission may view the application with disfavor." (Emphasis added.)

It is clear that the challenged policy was intended by the plan drafters to apply to properties within the UGB regardless of their particular zone designation. Recalling that there is no zone designation in the plan akin to "agricultural," the policy statements in the plan, set out in note 1, *supra,* unambiguously contemplate that properties currently in agricultural production within the UGB, however zoned, should be kept in such a use until the land is needed for the use for which it is zoned. For instance, the plan provides at 11: "* * * Land which is inside the City Limits and the urban growth boundary that is in agricultural use shall remain in agricultural use until it is needed for urbanization and can be provided with urban facilities."

■ A plan policy to retain agriculturally productive land in that use until such time as it is needed for the zoned use is not inconsistent with the concept of zoning designations. A zoning ordinance may be, but is not necessarily, a mere catalog of existing uses; nor does a zoning ordinance necessarily give an automatic license to a landowner to develop his or her property to any use permitted by its particular zone class. The comprehensive plan here involved sets forth a legislative decision as to which future property uses will or will not be in the public interest, and in what order. Where the comprehensive plan permits uses more intensive than a parcel's present use, the question of when and under what conditions the parcel may be permitted to be further developed can be made to turn on policies or factors within the zoning ordinance itself or the plan, provided they are applicable, clearly set out, and consistent with the zoning designation. Sublimity points out that the entire city is presently zoned at the ultimate end use designation.

We disagree with respondents' contention that Sublimity's "agricultural retention policy" is necessarily so inconsistent and inimical to a SFR zone that it cannot, as a matter of law, be employed to delay development of properties so zoned. With regard to respondents' parcel, the policy does not stand as an absolute bar to residential development — it merely delays such development until either the parcel cannot be realistically or productively farmed or there is a need in Sublimity for more residential lots. Moreover, retaining the parcel as agricultural does not, as

a practical matter, affect respondents' ability to develop it for residential use some time in the future. Therefore, assuming that respondents' parcel is capable of agricultural production and that there is no present need in Sublimity for more residential lots,[5] we conclude that Sublimity may employ its "agricultural retention policy" to defer the residential development of respondents' parcel at this time.

■ Contrary to respondents' position, this result is not inconsistent with the statewide land use planning scheme. Their argument on this point evinces a misconception as to the legal significance of an acknowledged UGB. LCDC's Statewide Planning Goal 14, the "Urbanization" Goal, specifies the considerations relevant to conversion of rural land to urban.[6] In pertinent part it provides:

"GOAL: To provide for an orderly and efficient transition from rural to urban use.

"Urban growth boundaries shall be established to identify and separate urbanizable land from rural land.

"Establishment and change of the boundaries shall be based upon consideration of the following factors:

"(1) Demonstrated need to accomodate long-range urban population growth requirements consistent with LCDC goals;

"(2) Need for housing, employment opportunities, and livability;

"(3) Orderly and economic provision for public facilities and services;

"(4) Maximum efficiency of land uses within and on the fringe of the existing urban area;

---

[5] Before the city and LUBA, respondents contended that, given the proximity of residential properties to the subject parcel, the parcel cannot be realistically and productively farmed. They further argued that there is a present need in Sublimity for more residential property. The city disagreed with these contentions, but LUBA found its findings inadequate and remanded for further factual development and the entry of more specific findings. Since, as noted, the appeal presents only the question of the agricultural retention policy's applicability and validity as a matter of law, we express no opinion as to respondents' factual contentions that the policy should not apply.

[6] Goal 14 was recently the subject of discussion, albeit in different contexts, in *1000 Friends of Oregon v. LCDC,* 292 Or 735, 642 P2d 1158 (1982) and *Willamette University v. LCDC,* 45 Or App 355, 608 P2d 1178 (1980).

"(5) Environmental, energy, economic and social consequences;

"(6) Retention of agricultural land as defined, with Class I being the highest priority for retention and Class IV the lowest priority; and,

"(7) Compatibility of the proposed urban uses with nearby agricultural activities.

"* * * * *

"Land within the boundaries separating urbanizable land from rural land shall be considered available over time for urban uses. Conversion of urbanizable land to urban uses shall be based on consideration of:

"(1) Orderly, economic provision for public facilities and services;

"(2) Availability of sufficient land for the various uses to insure choices in the market place;

"(3) LCDC goals; and

"(4) Encouragement of development within urban areas before conversion of urbanizable areas."

Under Goal 14, then, a city's UGB stands as the dividing line between "rural" and "urbanizable" land. The first seven factors govern the establishment of the line; the latter four govern the conversion of urbanizable land within an acknowledged UGB to urban uses. The import of this goal is that once LCDC has acknowledged an UGB, the lands within the boundary are no longer "rural," have been committed to urbanization and must be "considered available over time for urban uses." Since respondents' parcel is within Sublimity's acknowledged UGB, it must be deemed non-rural and urbanizable.

This is not to say, however, that a policy favoring retention of agricultural uses within an acknowledged UGB is improper or inconsistent with Goal 14. The dichotomy established by Goal 14 is between urban/urbanizable and rural, not between urban and agricultural. LCDC's definitions of these terms demonstrate that agricultural and rural are not synonymous and that an agricultural retention policy within an UGB is not a contradiction in terms:

"URBAN LAND: Urban areas are those places which must have an incorporated city. Such area may include

lands adjacent to and outside the incorporated city and may also: (a) Have concentrations of persons who generally reside and work in the area; and (b) Have supporting public facilities and services.

"URBANIZABLE LAND: Urbanizable lands are those lands within the urban growth boundary and which are identified and: (a) Determined to be necessary and suitable for future urban uses; (b) Can be served by urban services and facilities; and (c) Are needed for the expansion of an urban area.

"RURAL LAND: Rural lands are those which are out-side the urban growth boundary and are: (a) Non-urban agricultural, forest or open spaced lands or, (b) Other lands suitable for sparce settlement, small farms or acreage home-sites with no or hardly any public services, and which are not suitable, necessary or intended for urban use." OAR 660-15-000.

When a city which anticipates some future growth establishes an UGB, it must generally include within the boundary properties that are not currently "urban" to serve as a buffer zone into which the city's growth may expand. These lands may be sparsely developed, agricultural, forest, or vacant. Their inclusion into the UGB makes them "urbanizable" but not ipso facto urban. Although inclusion within the UGB and within an urban zone classification necessarily is a determination that such properties will ultimately be developed as urban, the city may, as contemplated by the last four factors of Goal 14, establish policies governing the conversion of these urbanizable properties into urban uses. We see nothing improper or inconsistent with Goal 14 in Sublimity's decision to preserve the status quo with regard to agricultural land within its UGB until such time as the land is needed for urban purposes.

Reversed and remanded in accordance with LUBA's order.