TENLEY AND CLEVELAND PARK
EMERGENCY COMMITTEE, et
al., Petitioners,

v.

DISTRICT OF COLUMBIA BOARD OF
ZONING ADJUSTMENT, Respondent.

TENLEY AND CLEVELAND PARK
EMERGENCY COMMITTEE, et
al., Appellants,

v.

DISTRICT OF COLUMBIA, et
al., Appellees.

Nos. 87–468, 86–813.

District of Columbia Court of Appeals.

Argued July 5, 1988.
Decided Nov. 17, 1988.

Brian W. Smith and Diane L. Olsson, with whom Philip C. Olsson, and Nathalie V. Black, Washington, D.C., were on the brief, for appellants/petitioners.

Whayne S. Quin, with whom C. Francis Murphy, Louis P. Robbins, and John T. Epting, Washington, D.C., were on the brief, for appellees/intervenors/respondents 4000 Wisconsin Avenue Associates, et al.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, with whom Frederick D. Cooke, Jr., Acting Corp. Counsel at the time the memorandum was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., submitted a memorandum in lieu of brief for appellee District of Columbia.

Before ROGERS, Chief Judge,[*]
MACK, Associate Judge, and PRYOR,[**] Senior Judge.

ROGERS, Chief Judge:

The principal issue presented in these consolidated appeals is whether the District of Columbia Self Government Act and the District of Columbia Comprehensive Plan Act of 1984 impose a moratorium on private real estate development permitted as a matter of right under the applicable zoning regulations where those regulations may be inconsistent with the District's Comprehensive Plan. Appellants Tenley and Cleveland Park Emergency Committee ("TACPEC") and Philip Mendelson appeal from a decision of the Superior Court dismissing their complaint challenging the issuance and validity of the building permit for a project located at 4000 Wisconsin Avenue, N.W. on the ground that they had failed to exhaust available administrative remedies before either the District of Columbia Zoning Commission or the Board of Zoning Adjustment (BZA). They also contend that the trial court erred in ruling that the Advisory Neighborhood Commission (ANC) 3–C received actual and statutory notice, to which it was entitled under D.C. Code § 1–261(c) (1987 Repl.), prior to the issuance of the building permit. They appeal too from the court's denial of a motion to amend the judgment or for a new trial. TACPEC and Mendelson, joined by the North Cleveland Park Citizens' Association,[1] also appeal from a decision of the District of Columbia BZA that it did not have jurisdiction to consider either the status and applicability of the Comprehensive Plan to the Wisconsin Avenue project or whether the notice requirement under D.C. Code § 1–261(c) had been satisfied. They further contend that the BZA's alternative ruling that ANC 3–C received actual and statutory notice is not supported by substantial evidence in the record.

We hold that the Home Rule Act and the Comprehensive Plan do not impose a moratorium on matter of right development and that because the Zoning Commission is the exclusive forum for addressing issues of inconsistency under the Comprehensive Plan, TACPEC failed to exhaust its administrative remedy by not presenting its case to the Zoning Commission. We also hold that ANC 3–C received the notice to which it was entitled under D.C. Code § 1–261(c)(3). Accordingly, we affirm.

I

This appeal involves the validity of a building permit issued to 4000 Wisconsin Avenue Associates[2] ("the developers") by

---

[*] Judge Rogers was an Associate Judge of this court at the time of argument. Her status changed to Chief Judge on November 1, 1988.

[**] Judge Pryor was Chief Judge of this court at the time of argument. His status changed to Senior Judge on November 2, 1988.

1. For simplicity, we refer to all appellants as TACPEC.

2. Intervenor/Appellee 4000 Wisconsin Avenue Associates Limited Partnership, the developer of the project, is a partnership comprised of The Donohoe Construction Company and The Holladay Corporation. Other appellees are Carol Thompson for the District of Columbia Depart-

the District of Columbia government for the construction of a large mixed use office-retail project at 4000 Wisconsin Avenue, N.W.[3] By application dated May 24, 1985 and filed on June 3, 1985, the developers submitted preliminary plans for the project to the Zoning Administrator for zoning review and approval. Changes and adjustments were made to the plans over the next several months. The developers formally applied to the District of Columbia Department of Consumer and Regulatory Affairs (DCRA) for a permit to build the project on December 4, 1985. The application was included in a list, prepared weekly by the DCRA's Permit and Certificate Issuance Branch, which indicates projects for which applications have been received and permits issued. Pursuant to D.C. Code § 1–261 (1987 Repl.), which requires the District government to provide thirty days written notice of building applications to affected Advisory Neighborhood Commissions (ANCs), the list was mailed to ANC 3–C on December 9, 1985, and received by ANC 3–C Commissioner Philip Mendelson on December 18, 1985.

The thirty-day statutory period for comment by the ANC on the proposed building permit elapsed without the DCRA receiving any recommendations from ANC 3–C.

DCRA issued a building permit to the developers on February 19, 1986. At the time the building permit was issued, the zoning regulations applicable to the project site permitted construction of the proposed building as a matter of right.[4] ANC 3–C subsequently wrote letters protesting the issuance of the building permit but by letter dated March 11, 1986, DCRA Director Carol Thompson declined to suspend the permit.

On February 28, 1986, TACPEC filed an appeal with the Board of Zoning Adjustment (BZA) challenging the validity of the building permit issued by the DCRA. TACPEC's primary argument was that the building permit was improperly issued because the building would be in violation of the District's Comprehensive Plan.[5] TACPEC also alleged that ANC 3–C had received insufficient notice under D.C. Code § 1–261. The BZA ruled that it did not have jurisdiction over the issue of the alleged inconsistency of the proposed development with the Comprehensive Plan because "[r]esponsibility for comprehensive plan consistency issues is vested in the Zoning Commission."[6] The BZA also concluded that it was without jurisdiction to consider the issue of notice under D.C.Code

---

ment of Consumer and Regulatory Affairs and John Touchstone as the Director of the D.C. Department of Public Works.

3. The site on which the building is located consists of 4.7 acres at the west side of Wisconsin Avenue, bordering on Upton Street, N.W. and Glover Archbold Parkway, and is the fourth largest building in northwest Washington, and the eighth largest commercial building in the District.

4. When the building permit was issued, the project site was zoned "C–3–A" which permits medium density mixed commercial development and allows buildings to be erected to a height of 65 feet with a floor area ratio of 2.5. 11 DCMR § 740 (1987). The specifications of the proposed building were within "C–3–A"'s permissible limits. No special exception or variance was sought or required.

5. TACPEC also challenged permits for excavation, sheeting and shoring and for public space. The BZA correctly ruled that it lacked jurisdiction to address the validity of these permits because they had not been issued by the Zoning

Administrator or under the authority of the zoning regulations. *See* 12 DCMR § 107.1(2) (1986); 12 DCMR § 108.2 (1986).

6. The BZA explained:

The Zoning Commission for the District of Columbia has the statutory duty to insure that the Zoning Regulations are not inconsistent with the Comprehensive Plan. The Land Use Element of the Comprehensive Plan was enacted in March, 1985, ten years after the installation of the elected Mayor and Council of the District of Columbia. Just as it was reasonable for the Executive and Legislative branches to take the time which they determined to be reasonably required to prepare and adopt the Comprehensive Plan, so also is it reasonable for the Zoning Commission to determine a reasonable schedule for the conduct of its business. The Board may not exercise oversight over the Commission in that respect. Further, the Zoning Commission is the only body which may amend the Zoning Regulations, including those provisions which govern matter-of-right developments.

§ 1–261; alternatively, the BZA found that the notice requirements were met.

Overlapping the proceedings before the BZA, TACPEC filed a complaint on March 19, 1986, for declaratory and injunctive relief. TACPEC's complaint alleged that the District government had violated D.C. Code § 1–261 by not providing ANC 3–C with adequate notice of the pending building permit application, thereby depriving ANC 3–C of its statutory right to file written recommendations with respect to the proposed permit.[7] TACPEC also claimed that the District's failure to give ANC 3–C adequate notice of a construction permit application violated the due process clause of the fifth amendment of the U.S. Constitution. TACPEC further alleged that the density of the proposed building violates the Comprehensive Plan for the District of Columbia. The trial court denied the motion for a temporary restraining order, TACPEC withdrew the motion for a preliminary injunction, and a bench trial was held on April 22–24, 1986. The trial court granted the District's motion to dismiss at the close of TACPEC's case. With respect to the validity of the building permit issued by the DCRA, the trial court held that TACPEC had not exhausted its administrative remedies because it had not sought review of that decision before the BZA or the Zoning Commission; the trial court did not decide which was, or if both were, the

appropriate agency to provide TACPEC administrative relief. In the alternative, the court held that ANC 3–C received the statutory notice required under D.C. Code § 1–261.[8] Thereafter the court denied TACPEC's motion to amend the judgment or, in the alternative, for a new trial.

## II

TACPEC contends on appeal that the trial court and the BZA both erred in ruling that they were without jurisdiction to adjudicate TACPEC's claim that the building permit for private development at 4000 Wisconsin Avenue, although concededly permitted as a matter of right under the applicable zoning regulations, was invalid as inconsistent with the District's Comprehensive Plan. In its own words, TACPEC claims that "[t]he heart of [its] case is that since the Comprehensive Plan controls land use actions in the District and the challenged permits [see note 5, *supra*] violate the Plan, those permits are illegal, regardless of whether the permitted activity would comply with the zoning regulations." Consideration of the District of Columbia Self–Government Act[9] and the Comprehensive Plan demonstrate that the Comprehensive Plan is not self-executing and does not directly regulate the development of private property in the District of Columbia.[10]

7. TACPEC also alleged that the District government failed to provide notice of the applications for excavation, sheeting and shoring permits, and of the May 24, 1985, submission for zoning approval. Although these issues appeared in TACPEC's complaint, no evidence regarding these issues was presented at trial and, therefore, we decline to reach them on appeal. We also do not reach the notice issue with respect to the public space permit which was neither pleaded nor addressed in the trial court. *Williams v. Gerstenfeld,* 514 A.2d 1172, 1177 (D.C.1986).

8. The trial court also held that TACPEC had failed to establish its claim that traffic generated by the new building would become a public or private nuisance. This issue has not been pursued on appeal. Another claim relating to Department of Public Works permits for paving Glover–Archbold Park and an extension of Upton Street was dismissed as premature. A separate action in Superior Court relating to these

permits also resulted in a judgment against TACPEC. *TACPEC v. District of Columbia,* 115 Daily Wash.L.Rptr. 1973 (Sept. 21, 1987). This case is currently on appeal in this court. *TACPEC v. District of Columbia,* No. 87–604.

9. The District of Columbia Self–Government and Governmental Reorganization Act, Pub.L. No. 93–198, 87 Stat. 774 (1973), *reprinted in* 1 D.C. Code 175 (1981) (Home Rule Act).

10. The first step in statutory construction is to examine the language of the statute and to interpret its words according to their plain and ordinary meaning. *United States v. Bailey,* 495 A.2d 756, 760 (D.C.1985); *Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 754 (D.C. 1983) (en banc). Our primary goal is to ascertain and give effect to the intent of the legislative body that drafted the language. *Rosenberg v. United States,* 297 A.2d 763, 765 (D.C.1972) (quoting *General Motors Acceptance Corp. v. One 1962 Chevrolet Sedan,* 191 A.2d 140, 142

### A.

Before Congress enacted the Home Rule Act, land use planning for both the federal and District governments was vested in the National Capital Planning Commission (NCPC). In accordance with the Home Rule Act's purpose to delegate certain governmental powers to the District's newly created local government, the Home Rule Act fundamentally altered the way in which future planning decisions would be made in the nation's capital. The Act mandated, for the first time, the development of a Comprehensive Plan for the District of Columbia, to be created through the joint efforts of NCPC and the District of Columbia government. The Act retained NCPC as the central planning agency for the federal government, but restricted its authority to developing the federal elements of the new Comprehensive Plan and to exercising veto authority within sixty days over those proposed District elements, prepared by the Mayor and approved by the Council of the District of Columbia, that NCPC determined would have a negative impact on the interests or functions of the federal establishment. D.C. Code §§ 1–2002(a)(2) & (4) (1987 Repl.); *see* Home Rule Act § 203(a). In addition, the Act vested the Mayor with the responsibility for the "coordination of planning activities of the [District] government and the ... implementation of the District's elements of the comprehensive plan for the National Capital...." D.C. Code § 1–244(a) (1987 Repl.); *see* Home Rule Act § 203(a).

The Home Rule Act also provided for a significant change in the standard governing the Zoning Commission's zoning au-

thority. *See generally Citizens Ass'n v. Zoning Comm'n*, 392 A.2d 1027 (D.C. 1978) (en banc) (*Georgetown III*). Before passage of the Act, D.C. Code § 5–414 (1973) provided that zoning maps and regulations "shall be made in accordance with a comprehensive plan...." In *Citizens Ass'n v. Zoning Comm'n*, 155 U.S. App. D.C. 233, 477 F.2d 402 (1973) (*Georgetown II*), the United States Court of Appeals for the District of Columbia Circuit reaffirmed long standing case law in the District and held that the term "comprehensive plan" was not synonymous with the so-called "Red Book" comprehensive plan that NCPC had developed pursuant to the National Capital Planning Act of 1952, *see* D.C.Code §§ 1–1001 *et seq.* (1973), but only required the Zoning Commission to zone on a uniform and comprehensive basis. *Georgetown II, supra,* 155 U.S. App.D.C. at 237–38, 477 F.2d at 406–07. In part to overrule the *Georgetown II* decision, Congress amended the Zoning Enabling Act [11] to provide that "Zoning maps and regulations, and amendments thereto, shall not be inconsistent with the comprehensive plan for the national capital...." D.C. Code § 5–414 (1988 Repl.); *see* Home Rule Act § 492(b)(1).[12] In addition, Congress specifically provided that "The Zoning Commission shall exercise *all* the powers and perform *all* the duties with respect to zoning in the District as provided by law." D.C. Code § 5–412(e) (1988 Repl.) (emphasis added); *see* Home Rule Act § 492(a). Significantly, for purposes of this appeal, the Home Rule Act left unchanged D.C. Code

(D.C.1963)). The statutory meaning of a term must be derived from a consideration of the entire enactment against the backdrop of its policies and objectives. *Carey v. Crane Serv. Co.,* 457 A.2d 1102, 1105 (D.C.1983) (quoting *Don't Tear It Down v. Pennsylvania Ave. Dev. Corp.,* 206 U.S.App.D.C. 122, 128, 642 F.2d 527, 533 (1980)). Even where the words of a statute have superficial clarity, it is appropriate to undertake a review of the legislative history to aid in the ascertainment of legislative intent. *Office of People's Counsel v. Public Serv. Comm'n,* 477 A.2d 1079, 1084 (D.C.1984) ("words are inexact tools at best") (quoting *Harrison v. Northern Trust Co.,* 317 U.S. 476, 479, 63 S.Ct. 361, 363, 87 L.Ed. 407 (1943)). Finally, the D.C. Council's

interpretation of its responsibilities under the Home Rule Act is entitled to great deference. *Marshall v. District of Columbia Rental Hous. Comm'n,* 533 A.2d 1271, 1274 (D.C.1987); *Yu v. District of Columbia Rental Hous. Comm'n,* 505 A.2d 1310, 1312 (D.C.1986).

**11.** Act of June 20, 1938, 52 Stat. 797, ch. 534, *as amended,* D.C. Code §§ 5–413 *et seq.* (1988 Repl.).

**12.** *See also* Legislative History of the District of Columbia Self-Government and Governmental Reorganization Act, S. 1435 (Pub.L. No. 93–198) 93d Cong., 1st Sess. 1677 (Comm.Print (1973)).

§ 5–415 (1988 Repl.), which provides in relevant part:

> *The regulations* prior to June 20, 1938, adopted by the Zoning Commission under the authority of § 5–412 and *in force on June 20, 1938, including the maps* which at said date accompany and are a part of such regulations, shall be deemed to have been made and adopted and in force under §§ 5–413 to 5–432 and *shall* be and *continue in force* and effect *until* and as they may be *amended by the Zoning Commission* as authorized by said §§ 5–413 to 5–432. The Zoning Commission may from time to time amend the regulations or any of them or the maps or any of them.

*Id.* (emphasis added). The remainder of section 5–415, also left unrevised by the Home Rule Act, imposes notice and hearing requirements on the Zoning Commission for proposed amendments to the zoning regulations.

█ Thus, the Home Rule Act explicitly provides that the Zoning Commission is the exclusive agency vested with power to enact zoning regulations for the District of Columbia. TACPEC does not seriously dispute that the Zoning Commission is the sole governmental body entrusted with authority to amend the zoning regulations, but rather contends that once the Comprehensive Plan mandated by the Home Rule Act became law, any inconsistency between it and the existing zoning regulations would serve to impose a moratorium on private real estate development to the extent of the inconsistency. However, the Home Rule Act did not purport to displace existing statutory law which plainly mandates that zoning regulations and maps already in place continue to have the full force and effect of law until such time as the Zoning Commission shall amend them. D.C. Code § 5–415. Nor does the Comprehensive Plan or its legislative history reflect any intent on behalf of the Council of the District of Columbia to impose a moratorium on development until such time as the existing zoning regulations are conformed by the Zoning Commission to those elements of the Comprehensive Plan with which the zoning regulations are alleged to be inconsistent.

B.

Pursuant to the Home Rule Act, §§ 203(a), 423(a), the D.C. Council enacted the Comprehensive Plan on April 10, 1984. District of Columbia Comprehensive Plan Act of 1984, D.C.L. No. 5–76 (1984) (Comprehensive Plan Act). The Comprehensive Plan Act adopted most of the District Elements of the Comprehensive Plan including those for economic development, housing, environmental protection, transportation, public facilities, urban design, preservation and historic features, the downtown area and human services. *Id.* at 1. The land use element of the Comprehensive Plan, Title XI, was enacted separately on March 16, 1985. District of Columbia Comprehensive Plan Act of 1984 Land Use Element Amendment Act of 1984, D.C.L. No. 5–187 (1985) (Land Use Act). Section 102 of the Comprehensive Plan Act sets forth the manner in which the District Elements of the Comprehensive Plan are to be interpreted and provides in pertinent part:

> Except as specifically provided by other law, including but not limited to An Act Providing for the zoning of the District of Columbia and the regulation of the location, height, bulk, and uses of buildings and other structures and other purposes, as amended . . ., or as specifically provided by the District elements of the Plan itself, the District elements of the Plan are a *guide intended to establish broad policies and goals* while affording flexibility for future implementation and are not binding policy directives. The District elements of the Plan should not be construed as a delegation of authority to establish new programs.

*Id.* (emphasis added) (citation omitted). With respect to the Land Use element of the Comprehensive Plan, § 1101(k) of the Land Use Act specifically declares that "The Land Use Element does not identify or fix every use, height, and density on every block in the District. The text and the maps construct *a guiding framework* within which public and private land use and zoning decisions are to be made." *Id.*

(emphasis added). Section 1134 of the Land Use Act states the Plan's Public Action Objectives, which include the goals "to improve enforcement of land use regulations [and] to establish procedures for monitoring public and private land use actions for consistency with the policies of the Plan...." [13] Among the various policies established in support of the Plan's Public Action Objectives, the Land Use Act provides:

> Review the Zoning Regulations of the District of Columbia to determine that they are not inconsistent with provisions of the Plan and, *based upon a zoning program to be developed* by the Office of Planning, recommend required changes including performance standards, text and map amendments, where appropriate, for action by the Zoning Commission for the District of Columbia.

Land Use Act § 1135(5) (emphasis added).

Thus, both the Comprehensive Plan Act and the Land Use Act make clear that the Comprehensive Plan is a broad framework intended to guide the future land use planning decisions for the District. While the Acts acknowledge that existing zoning regulations may be inconsistent in some instances with the policies outlined in the Comprehensive Plan, the Acts explicitly recognize that an examination of existing

zoning regulations for conformance with the Comprehensive Plan is necessarily a time-consuming process to be carried out by the Zoning Commission assisted by the Office of Planning in a reviewing program to be developed after enactment of the Comprehensive Plan by the D.C. Council. *See also* note 17, *infra.* In short, the Comprehensive Plan is not self-executing, and contrary to TACPEC's contention, this statutory language plainly does not evince any legislative intent to impose a moratorium on development in the District.

The legislative histories of the Comprehensive Plan Act and the Land Use Act are replete with statements that confirm the D.C. Council's intent in this regard. In the introduction to the Council committee report recommending adoption of the Comprehensive Plan Act, the report states that "The [Comprehensive] Plan is a framework for growth and change in the District of Columbia over the next 20 years." REPORT OF THE COMMITTEE OF THE WHOLE ON BILL 5–282, DISTRICT OF COLUMBIA COMPREHENSIVE PLAN ACT OF 1984 (Jan. 17, 1984) (COMPREHENSIVE PLAN ACT COMMITTEE REPORT). As to the impact on existing law, the report states:

> Comprehensive plans have guided the growth of American cities for over 50

---

**13.** Section 1136 of the Land Use Act provides generally for the adoption of generalized land use maps. Specifically, § 1136 declares that Map 1, which depicts general land use policies, be amended to indicate that the west side of Wisconsin Avenue, N.W., between Rodman Street, N.W., and Van Ness Street, N.W., is included in the moderate density commercial land use category. Land Use Act § 1136(b)(56), The moderate density commercial land use category provides for

> Shopping and service areas that generally provide a much broader range of goods and services are the predominant uses. Chain drug stores and grocery stores as well as branches of department stores, some specialty shops, and personal service establishments may be present.

Land Use Act § 1136(4)(H); *see also id.* § 1107(a)(2). In addition, § 1136 states that Map 3, which depicts generalized commercial, production and technical employment land use policies, be amended to indicate that the area near the intersection of Wisconsin Avenue and Van Ness Street should be a local neighborhood

rather than a multi-neighborhood center. Land Use Act § 1136(f)(9). In the Land Use Act commercial center classification scheme, local neighborhood centers call for the least intensive development of the three available classifications.

> Local neighborhood centers supply sales of daily groceries, sundries, convenience goods and personal services to neighborhood residents and workers. There is limited parking. Motorists are likely to go to larger concentrations of stores where parking and a greater selection of goods and services are more readily available. A small food and sundries store selling convenience items is usually a principal element of a local neighborhood center. Service stores such as gas stations, carryouts, barber shops, cleaners, diners, and bars also locate in local neighborhood centers. *There is limited office space.* Local neighborhood centers may be further subclassified to identify new centers to be established and existing centers to be upgraded.

Land Use Act § 1108(b)(1) (emphasis added).

years. Whether it is called a comprehensive plan, general plan, master plan, or city development plan, the purpose is usually the same: to provide *a statement of policy to guide future public decisionmaking.* Although many comprehensive plans address social policy issues, the primary emphasis is on physical development over an extended time, usually 10 to 20 years.

\* \* \* \* \* \*

Although the Plan serves as an important policy guide, its legal mandate is more limited. *Except as provided by other law or the Plan itself, the District elements are advisory. Thus the District elements are binding on zoning as provided in the zoning enabling act,* urban renewal as provided in the Redevelopment Act and public facilities planning as provided in the Plan. In other respects, however, the District elements guide but do not control government decisions.

*Id.* at 51 (emphasis added). The report specifically addresses the Plan's impact on zoning:

When the proposed District elements take effect, the Zoning Commission will be required to amend the Zoning Regulations to eliminate any inconsistency with the District elements.... After the District elements are adopted, *the Office of Planning, citizens and property owners will initiate zoning cases,* which will propose amendments to the Zoning Regulations.[14]

*Id.* at 52 (emphasis added).

The Comprehensive Plan Act Committee Report includes several documents which the Council intended as valid interpretative guides for judicial construction of the Act. *Id.* at 57. Pauline Schneider, Director of the Intergovernmental Relations Office of

the District government, wrote to D.C. Council Chairman David Clarke:

The Director, Office of Planning has requested that I ... respond[ ] to ... questions concern[ing] the zoning and urban renewal changes which may be necessary once the [Comprehensive] Plan is enacted and the process for making such changes. The Office of the Corporation Counsel has advised us that *the current zoning process will not be affected by the enactment of the Plan given the fact that the Home Rule Act specifically gives the Zoning Commission sole authority to adopt and amend the zoning regulations....* The Planning Office ... will prepare a zoning revision program ... based on the Comprehensive Plan for the guidance of the [Zoning Commission] to make any necessary changes.

Letter from Pauline Schneider to David Clarke (Dec. 23, 1983) (emphasis added). Another document prepared by the Office of Planning in November 1983, and appended to the committee report, describes various projected zoning actions necessary to implement the Comprehensive Plan including amendments to zoning regulations and maps.

The legislative history of the Land Use Act similarly reflects the intent of the D.C. Council that the process of conforming existing zoning regulations and maps to the Comprehensive Plan would occur sometime after the Plan became effective and that no moratorium on real estate development in the District be imposed by the Plan itself. With respect to the Land Use Act's impact on existing law,[15] the committee report states:

Like other District elements, the Land Use Element establishes *policies to guide future public decisions.* The District elements do not impose specific implementation techniques. This task is

---

14. As one illustration of how the process will work, the report noted that a full year passed before the Zoning Commission adopted orders establishing a special diplomatic zoning district required by the passage by the NCPC of the Foreign Missions and International Agencies Element. *Id.*

15. The Land Use Act Committee Report lists as one of the map changes for Ward 3 the designation of the northwest corner of Wisconsin Avenue, N.W., and Van Ness Street, N.W., as low density commercial. LAND USE ACT COMMITTEE REPORT at 19.

the responsibility of the various agencies charged with regulatory authority. Instead the District elements establish policies, which guide but do not direct.

REPORT OF THE COMMITTEE OF THE WHOLE ON BILL 5-507, DISTRICT OF COLUMBIA COMPREHENSIVE PLAN ACT OF 1984 LAND USE ELEMENT AMENDMENT ACT OF 1984, at 4 (1984) (LAND USE ACT COMMITTEE REPORT) (emphasis added). A distinguishing feature of the Land Use Act is in the inclusion of four generalized land use maps to complement the text of the Act. In this regard, the Land Use Act Committee Report states:

> The maps depict land use policies in a generalized manner. They do not identify specific parcels or properties. This "soft-edged" character is intended to provide policy guidance while affording needed flexibility. Although the language adopting the maps includes specific references to streets, blocks, and intersections, the maps are intended to remain generalized. The proposed legislation includes these specific descriptions because they are the only way the legislative body can give sufficient direction to the cartographers who must prepare the maps.

16. The committee report makes clear that the policies of the Land Use Element recognize that changes in the zoning regulations are needed and that to accomplish them the Office of Planning is to prepare a zoning modification program. In a letter of October 31, 1984, that was attached to the committee report, the response by the Office of Planning referred to the preliminary list of recommended zoning changes needed to implement the Comprehensive Plan that the Office had prepared and provided to the Council in November 1983, and advised:

Our implementation program will be initiated following the enactment of the Land Use Element of the Comprehensive Plan. The program includes not only preparing recommendations to the Zoning Commission regarding text and map changes but also a number of administrative and statutory changes to existing Executive Orders, permitting processes and laws.

The November 1983 list of zoning changes is the same document that also appears as an attachment to the Comprehensive Plan Act detailing projected zoning actions necessary to implement the Comprehensive Plan.

17. Section 101(6) of the Comprehensive Plan Act provides:

*Id.* The Committee report also specifically states that the generalized land use maps indicate objectives only and are not to be confused with the District zoning maps which are adopted by the Zoning Commission as part of the zoning regulations. *Id.* at 5.[16]

Also indicative of the D.C. Council's intent with respect to the imposition of a building moratorium is the Council's progress report to the Mayor on implementing the District elements of the Comprehensive Plan.[17] REPORT OF THE COMMITTEE OF THE WHOLE ON PR 6-320, PROGRESS REPORT ON THE COMPREHENSIVE PLAN FINDINGS RESOLUTION OF 1986 (1986) (PROGRESS REPORT). The progress report noted that the Mayor generally had not made satisfactory progress in implementing the District elements of the Comprehensive Plan and specifically observed the failure to make the zoning changes called for by the Plan that were necessary to protect residential neighborhoods from incompatible commercial development along Wisconsin Avenue. The report also noted the Mayor's failure to establish priorities and a timetable for implementing the Plan.[18]

> Continuous community input into the implementation of the Plan will be assured by the requirement of a periodic review. The *Mayor* of the District of Columbia *shall* submit to the Council of the District of Columbia every 2 years, a *report on the progress being made* by the District government *in implementing the Plan.* The Council of the District of Columbia will schedule public hearings on the matter and following each review period, will submit, to the Mayor of the District of Columbia, its findings and copies of the public testimony.

(Emphasis added).

18. Dissatisfaction with the response of the executive branch in implementing the Comprehensive Plan previously had been registered by Council Chairman Clarke in a letter to the Zoning Commission and the Office of Planning. Letter from David Clarke to Zoning Commission and Office of Planning (March 17, 1985). Chairman Clarke expressed concern that these agencies had failed to "sponsor any cases within the past year for the purpose of amending Zoning Regulations that are inconsistent with the Land Use Element of the Comprehensive Plan." *Id.* After noting the Zoning Commission's re-

To summarize, the language and the legislative histories of the Comprehensive Plan Act and the Land Use Act clearly reflect the intent of the D.C. Council that the process of conforming existing zoning regulations and maps to the Comprehensive Plan would occur after the Plan became effective and that matter-of-right real estate development in the District would continue while this process was underway. The Home Rule Act vests the Zoning Commission with exclusive authority to amend the zoning regulations of the District of Columbia. Home Rule Act § 492(a); D.C. Code § 5–412(e). By leaving D.C. Code § 5–415 untouched, the Home Rule Act did not repeal existing zoning regulations or maps, but rather provided for the creation of a Comprehensive Plan and a mechanism for its future implementation. The D.C. Council understood that the process of reviewing existing zoning regulations for consistency with the Comprehensive Plan would be a time-consuming, deliberative process, and although the Council may have anticipated that the conforming process would commence more quickly than it did, there is nothing in the statutes or legislative histories to suggest that enactment of the Comprehensive Plan would itself halt all matter-of-right development until that process was completed.

## C.

■ That the Comprehensive Plan was not self-executing and did not automatically impose a moratorium on matter-of-right private development did not leave TACPEC without a remedy once the Comprehensive Plan was enacted. TACPEC need not have awaited action by the Office of Planning and the Zoning Commission to raise the issue of inconsistency it now presses before this court. Under the District's Administrative Procedure Act, "[a]ny interested person may petition ... an independent agency, requesting the promulgation, amendment, or repeal of any rule." D.C. Code § 1–1506(b). TACPEC, as an interested party, could have initiated a petition before the Zoning Commission as early as March 16, 1985, the date the Land Use element of the Comprehensive Plan became effective, and requested emergency action to consider whether the existing zoning regulations were inconsistent with the Comprehensive Plan. The D.C. Council expected interested parties or individuals to

sponsibility to implement those aspects of the Plan that are inconsistent with existing zoning, the Chairman specifically referred to the western side of Wisconsin Avenue between Van Ness and Rodman Streets as an area requiring attention.

> The C–3–A zoning district along this corridor may be inconsistent with the Plan's designation of it for moderate density commercial land use with a local neighborhood center. The Zoning Regulations state that the C–3 district "is designed to accommodate important sub-centers supplementary to the Central Business district" and that the C–3–A district "shall permit medium density development." This language is quite similar to the language in the Plan that describes medium density commercial land use and multi-neighborhood or regional centers. The language in the Zoning Regulations that is used to describe C–2–A and C–2–B districts more closely resembles the language in the Plan that describes the designations of local neighborhood center and moderate density commercial land use.

*Id.* The Chairman urged the Zoning Commission to institute immediately the process of implementing the Comprehensive Plan with particular focus upon the areas of inconsistency to which the Commission already had been alerted. The implementation process should not be further delayed, the Chairman observed, because

> in the absence of changes in zoning, critical land use decisions will continue to be made in many areas throughout the District in a manner that not only is contrary to the policy objectives of the Comprehensive Plan but also may jeopardize the achievement of those objectives during the life of the Plan. *In the case of the western side of Wisconsin Avenue between Van Ness and Rodman Streets, it already is too late to affect a controversial "matter-of-right" development that is underway at 4000 Wisconsin Avenue,* but there are other adjacent parcels where new zoning could provide protection that is consistent with the Comprehensive Plan.

*Id.* (emphasis added). The Chairman sent another copy of this letter to the Zoning Commission as an attachment to a later letter to the Commission advising of the Council's unanimous approval of the Progress Report's general findings of "insufficient progress ... in the examination and initiation of cases where present zoning is inconsistent with the Land Use Element of the Comprehensive Plan." Letter from David Clarke to Zoning Commission (July 8, 1986).

initiate cases before the Zoning Commission where inconsistency between current zoning regulations and the Comprehensive Plan allegedly exists. COMPREHENSIVE PLAN ACT COMMITTEE REPORT at 52 ("the Office of Planning, citizens and property owners will initiate zoning cases, which will propose amendments to the Zoning Regulations"): *see also* note 18, *supra.* The Zoning Commission is authorized to issue emergency orders, and has done so, on several highly publicized occasions, to prevent matter-of-right development permitted under preexisting zoning regulations. D.C. Code § 1–1506(c); *see Citizens Ass'n v. Washington,* 291 A.2d 699, 702 n. 3 (D.C. 1972) (*Georgetown I*); *Georgetown II, supra,* 155 U.S. App.D.C. at 236 & n. 9, 477 F.2d at 405 & n. 9; *Salyer v. McLaughlin,* 100 U.S. App.D.C. 29, 31, 240 F.2d 891, 893 (1957); *Ruppert v. Washington,* 366 F.Supp. 686 (D.D.C.1973). Had a timely petition [19] been filed with the Zoning Commission, judicial relief would have been available [20] to review the Commission's determination of consistency.[21] However, the Zoning Commission is the only forum [22] capable of granting the zoning change TACPEC seeks,[23] and therefore TACPEC's failure to pursue any action before the Commission amounts to a failure to exhaust administrative remedies.

Accordingly, we hold that the Zoning Commission is the exclusive agency vested with responsibility for assuring that the zoning regulations are not inconsistent with the Comprehensive Plan, and that TACPEC failed to exhaust its administrative remedies.

### III

■ TACPEC also contends that the trial court and the BZA [24] erred in ruling that

**19.** We do not reach any issue concerning the precise moment a property owner's right to pursue matter-of-right development vests. *See* 11 DCMR § 3202.6 (1987).

**20.** Judicial review of rulemaking proceedings before the Zoning Commission is initially in the Superior Court, while initial judicial review of contested case proceedings is in this court. D.C. Code § 1–1510; *Georgetown III, supra,* 392 A.2d at 1029 n. 3; *see Capitol Hill Restoration Soc'y v. Zoning Comm'n,* 380 A.2d 174, 184 (D.C.1977), *overruled in part on other grounds, Georgetown III, supra,* 392 A.2d 1027. Judicial relief may also be available to compel agency action in the event of unwarranted or unreasonable delay. *See Georgetown I, supra,* 291 A.2d at 705 n. 15.

**21.** TACPEC cites a number of cases to support its assertion that the District of Columbia is a "consistency" jurisdiction, *i.e.,* that zoning maps and regulations must be consistent with the Comprehensive Plan. *See, e.g., Neighborhood Action Group v. Calaveras County,* 156 Cal. App.3d 1176, 203 Cal.Rptr. 401 (1984); *Philippi v. City of Sublimity,* 294 Ore. 730, 662 P.2d 325 (1983); *see generally* 1 A. RATHKOPF & D. RATHKOPF, THE LAW OF ZONING AND PLANNING § 12.04(2), at 12–15 (1987). Case law from other jurisdictions, however, is unhelpful in this area of the law because "[t]he extent to which zoning decisions must conform to independent comprehensive plans varies from state to state depending upon the phraseology of the consistency legislation and the nature of the mandatory plan." 5 P. ROHAN, ZONING AND LAND USE CONTROLS § 37.03[2], at 37–50 (1988) (footnotes omitted). The cases cited by TACPEC are readily distinguishable.

**22.** The BZA and the Zoning Administrator have no power to implement the Comprehensive Plan. The BZA's enabling statute explicitly states that it "shall not have the power to amend any [zoning] regulation or map." D.C. Code § 5–424(e) (1981); *see Rose Lees Hardy Home & School v. District of Columbia Bd. of Zoning Adjustment,* 343 A.2d 564, 566 (D.C.1975); *Palmer v. District of Columbia Bd. of Zoning Adjustment,* 287 A.2d 535, 539 (D.C.1972). The Zoning Administrator is limited to enforcing and certifying occupancy regulations. 11 DCMR § 3200 (1987); Reorg. Order No. 55, Pt. III F, 1 D.C. Code § 185 (1973).

**23.** The parties have represented to us that on May 21, 1987, the Zoning Commission voted to rezone the area at issue from C–3–A to C–2–B, the conformance Chairman Clarke advocated, *see* note 18, *supra,* and the kind of lower density zoning that TACPEC argued was mandated by the Comprehensive Plan. To our knowledge, the Zoning Commission has yet to issue an order to that effect. *See* 11 DCMR § 3028.8 ("A written order setting forth a final action shall become final and effective upon publication in the *D.C. Register,* unless a later effective date is provided for by the Commission.").

**24.** The BZA ruled that it did not have jurisdiction to consider the notice issue, but nevertheless heard evidence and rendered its decision on the issue. The District of Columbia urges that the BZA has ancillary jurisdiction to consider certain limited threshold procedural issues, such as notice, that arise in the context of substantive zoning disputes before the BZA. It cites *Brown v. District of Columbia Bd. of Zon-*

the list of building applications sent to ANC 3–C by the DCRA was sufficient notice as a matter of law under D.C. Code § 1–261(c).[25] Section 1–261(c)(3) requires that "each affected Advisory Neighborhood Commission is provided regularly by mail with a current list of applications for construction and demolition permits within the boundaries of that Advisory Neighborhood Commission." On December 18, 1985, ANC 3–C received a list of building permits applied for and issued by the DCRA's Permit and Certificate Issuance Branch during the week of December 2–6, 1985. Issued building permits are listed first and are designated with the letter "B" and a number. Pending building permit applications follow and are designated with the letter "A" and a number. The list of "A" permits included a reference to the application for the 4000 Wisconsin Avenue, N.W. project and identified it by the letter "A" and a number, by street address, lot and square numbers, and indicated that the application was for a "new building." The listing also stated the date that the application was received, that plans had been filed, the amount of the fee and the date it was paid, and a projected cost of $22,000,-000.

We hold that this list provided ANC 3–C with the statutory notice to which it was entitled under D.C. Code § 1–261(c)(3). *See Kopff, supra* note 24, 381 A.2d at 1380–81. While the list may not have been a "model of clarity," to borrow the BZA's observation, we are satisfied that in view of the clear statutory mandate to provide ANCs with current lists of construction applications, the list sufficiently distinguished applications from issued permits to place ANC 3–C on notice that a permit application for 4000 Wisconsin Avenue was pending. *See American Sec. Bank v. American Motorists Ins. Co.,* 538 A.2d 736, 739–40 (D.C.1988); *George Washington Univ. v. District of Columbia Bd. of Zoning Adjustment,* 429 A.2d 1342, 1345 (D.C. 1981).[26] The BZA concluded that the list was "more than adequate for any person with an interest in proposed construction to become informed about the significance of [the] distinction [between the "A" and "B" permits], and thereby to know when an application is pending." We think this conclusion even more compelling for elected representative ANC commissioners.

Accordingly, we affirm both the judgment of the trial court and the decision of

*ing Adjustment,* 413 A.2d 1276, 1280–81 (D.C. 1980), *appeal after remand,* 486 A.2d 37 (1984), in which the court held that the BZA had inherent authority, and the duty to protect the integrity of its proceedings, to entertain a motion to disqualify an attorney alleged to have violated the revolving door, conflict of interest rule (MODEL CODE OF PROFESSIONAL RESPONSIBILITY DR 9–101(B) (1979)). 413 A.2d at 1284. In view of our decision in *Kopff v. District of Columbia Alcoholic Beverage Control Bd.,* 381 A.2d 1372 (D.C.1977), construing the Home Rule Act and the act setting forth the duties and responsibilities of the ANCs (D.C. Law 1–58) to require agencies to give "great weight" to the ANC's written comments and to discuss the issues raised therein in the agency's decision on the merits, *id.* at 1384, the District's position is not without some appeal. However, we need not decide whether the BZA has jurisdiction to decide the notice issue. Assuming that the BZA did have such jurisdiction, its finding that ANC–3 received the statutory notice to which it was entitled was also the finding of the trial court.

**25.** Although the BZA's decision on the notice issue used the term "actual notice," the BZA's findings of facts numbers 11 through 15 make clear that the BZA more precisely determined only that the list of applications sent by the DCRA to ANC 3–C complied with the statutory requirements of D.C. Code § 1–261(c)(3).

**26.** In view of our conclusion that ANC 3–C received adequate notice under D.C. Code § 1–261(c)(3), we do not reach the trial court's alternative ruling that ANC 3–C also had actual notice of the pendency of the building permit application. *See Shiflett v. District of Columbia Bd. of Appeals and Review,* 431 A.2d 9, 10 (D.C. 1981). In any event, TACPEC's reliance on ANC 3–C Commissioner Philip Mendelson's testimony is misplaced because the trial court specifically discredited his testimony. *Washington v. District of Columbia,* 429 A.2d 1362, 1369–70 (D.C.1981) (credibility determination is within the province of the trier of fact). *See American Sec. Bank, supra,* 538 A.2d at 739–40; *George Washington Univ., supra,* 429 A.2d at 1345.

the BZA.[27]

27. TACPEC's final contention, that the District's failure to provide adequate notice of the pending building permit application denied ANC 3–C due process, is meritless. Assuming *arguendo* that the District provided no notice at all, this failure would establish only a statutory violation of D.C. Code § 1–261. ANCs are political subdivisions of the District of Columbia government and therefore do not receive due process protections under the Constitution against actions of the District of Columbia. *Williams v. Baltimore,* 289 U.S. 36, 40, 53 S.Ct. 431, 432, 77 L.Ed. 1015 (1933); *Bowen v. State Comm'n of Corrections,* 104 A.D.2d 238, 239–40, 484 N.Y.S. 2d 210, 212 (N.Y. App.Div.1984).